UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EE TONG SEE,<br><br>        Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:13-cv-01817 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF EE TONG SEE |

        Plaintiff Ee Tong See asserts she is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge ("ALJ") improperly evaluated the opinion of a treating physician, and seeks review of the administrative decision denying her claims for benefits. Because the ALJ identified specific and legitimate reasons to reject the opinion and the residual functional capacity is supported by substantial evidence in the record, the ALJ's decision is **AFFIRMED**.

## PROCEDURAL HISTORY

        Plaintiff filed an application for supplemental security income on October 27, 2010, alleging disability beginning December 1, 2009. (Doc. 9-3 at 17.) The Social Security Administration denied her claim initially and upon reconsideration. (Doc. 9-4.) After requesting a hearing, Plaintiff testified before an ALJ on July 6, 2012. (*See* Doc. 9-3 at 33.) The ALJ determined Plaintiff was not disabled,

1

and issued an order denying benefits on August 3, 2012. (*Id.* at 14-27.) Plaintiff requested review of the ALJ's decision by the Appeals Council of Social Security, which was denied. (*Id.* at 5-7.) Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The Court must uphold the ALJ's determination that the claimant is not disabled if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under Title XVI of the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of

disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* In making these determinations, the ALJ must consider testimonial evidence and objective medical evidence. 20 C.F.R. § 416.927.

**A.   Relevant Medical Evidence[1]**

Plaintiff had an initial assessment with Dr. Angela Crisanto at the Tulare County Health and Human Services Agency on December 31, 2009. (Doc. 9-8 at 167.) Plaintiff "reported increasing depression over the past 4 years," which had "increased significantly" in the past several months." (*Id.*) Plaintiff said she stayed in bed or on the couch all day, lost interest in activities, and "ha[d] to be prompted to shower and go to the restroom." (*Id.*) She had "no motivation to shower or maintain good personal hygiene." (*Id.*) Dr. Crisanto diagnosed Plaintiff with a major depressive disorder and gave her a GAF score of 50.[2] (*Id.* at 172.)

In January 2010, Plaintiff reported she "cooked two meals in two weeks and ha[d] not gone anywhere else because she [did] not feel like it." (Doc. 9-8 at 164.) She agreed to "attend two community functions weekly to alleviate isolation" and "explore pleasurable activities to promote wellness." (*Id.* at 165.) In February 2010, Plaintiff continued to report that she was not cooking or engaging in "activities to promote wellness," and Marilyn Buchanan, LMFT, believed Plaintiff "had

---

[1] Plaintiff does not challenge the ALJ's findings related to her physical impairments. Therefore, the only medical evidence related to her mental impairments is summarized herein by the Court.

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("*DSM-IV*"). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

many excuses." (*Id.* at 162.)

Dr. Hoang Tieu treated Plaintiff at the Visalia Adult Clinic on March 10, 2010. (Doc. 9-8 at 160.) Plaintiff reported that she had a low self-esteem and she felt "hopeless and worthless." (*Id.*) According to Dr. Tieu, Plaintiff was cooperative and "fairly groomed with fair personal hygiene." (*Id.*) Dr. Tieu prescribed Remeron "for depression and insomnia." (*Id.*)

In April 2010, Dr. Tieu noted that Plaintiff knew her name but did "not know her age, the name of the city, the month or the year." (Doc. 9-8 at 158.) In addition, Plaintiff's concentration, abstract thinking, and short-term memory were decreased. (*Id.*) Dr. Tieu increased Plaintiff's dosage of Remeron and started her on Ability "to control her psychotic symptoms." (*Id*. at 159.)

On June 4, 2010, Plaintiff went to the Visalia Adult Clinic for a medical evaluation with Dr. Tieu, and "appear[ed] very stressed out." (Doc. 9-8 at 155.) Mary Martinez, LPT, noted that Plaintiff reported she had been arguing with her husband, and Plaintiff told Dr. Tieu that she wanted to use a knife to hurt herself. (*Id.*) Dr. Tieu requested a 5150 evaluation, after which Plaintiff was cleared to return home because she had a "viable plan for safety and self-care." (*Id.* at 154.)

Dr. Gilbert Saul had a consultation with Plaintiff on June 29, 2010 after Plaintiff "was erroneously put in to see [him]" at the clinic. (Doc. 9-8 at 152.) Plaintiff reported her medication was helping and "she was feeling better." (*Id.*) Dr. Saul observed that Plaintiff was "alert and oriented" and she had "[n]o delusions, hallucinations or incoherency of thought." (*Id.*)

At the next appointment with Dr. Tieu in September 2010, Plaintiff reported she was taking the medication regularly and that it was helping. (Doc. 9-8 at 151.) She said she was "feeling better gradually" and sleeping better at night. (*Id.*) Plaintiff was living with her son, and her daughter visited "to help her with the cooking and cleaning." (*Id.*) Dr. Tieu observed that Plaintiff was "making good eye contact, cooperative." (*Id.*) Plaintiff reported that on occasion she went with her daughter to the lake where she had a good time. (*Id.*) Dr. Tieu opined Plaintiff was "doing well," and encouraged her to continue taking the medication regularly. (*Id.*)

In December 2010, Plaintiff was "cooperative, groomed well [and made] good eye contact." (Doc. 9-8 at 150.) Plaintiff did not report any problems. (*Id.*)

In February 2011, Plaintiff visited the Visalia Adult Clinic for a medication follow-up. (Doc. 9-

4

9 at 61.) Dr. Tieu noted, "She related that she takes the medication regularly and the medication helps her. She is feeling good. She sleeps well at night." (*Id.*) However, Plaintiff also reported she "is not able to tolerate loud noise and she is often isolative and does not socialize with other people." (*Id.*) Plaintiff "described her mood as good." (*Id.*) However, she reported "her sister visits her and she has a good time." (*Id.*) According to Dr. Tieu, Plaintiff was alert, cooperative, "calm and friendly," and "making good eye contact." (*Id.*) Dr. Tieu found "[n]o psychotic symptoms presented" and opined Plaintiff was "doing well." (*Id.*)

Dr. Murillo completed a psychiatric review technique and mental residual functional capacity assessment on March 4, 2011. (Doc. 9-9 at 41-55.) Dr. Murillo believed Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 50.) Further, Dr. Murillo opined Plaintiff was "not significantly limited" with her ability to understand, remember, and carry out very short and simple instructions. (*Id.* at 53.) On the other hand, Plaintiff was "moderately limited" with her ability to understand, remember, and carry out detailed instructions. (*Id.*) According to Dr. Murillo, Plaintiff was "not significantly limited" in all other areas of concentration, social interaction, and adaptation. (*Id.* at 53-54.) Dr. Murillo noted that the record showed Plaintiff's "[d]epression improved with [treatment]." (*Id.* at 41.) Consequently, Dr. Murillo opined that Plaintiff was able to sustain simple, repetitive tasks. (*Id.*)

On March 29, 2011, Dr. Tieu saw Plaintiff for another medication evaluation. (Doc. 9-9 at 57.) Melanie Larson, LVN, observed that Plaintiff was "groomed well" and her "hygiene [was] good." (*Id.*) Similarly, Dr. Tieu noted Plaintiff was "doing well" and continued to report she "slept well at night" and "the medication helped her." (*Id.* at 81.) Likewise, she reported "her daughter visits her and she has a good time." (*Id.*) Plaintiff did not report having any problems. (*Id.* at 57.)

Dr. Kravatz reviewed the record in July 2011, including treatment records from Dr. Tieu. (Doc. 9-9 at 73.) Dr. Kravatz noted, "Claimant is responding well to [her] meds." (*Id.*) Further, Dr. Kravatz observed that "although [she] is reporting some isolation [she] is able to enjoy visits [with] family members." (*Id.*) Therefore, Dr. Kravatz affirmed the assessment of Dr. Murillo "as written." (*Id.*)

In July 2011, Plaintiff told Dr. Tieu she was sleeping well and the medicine was helping. (Doc.

9-9 at 79-80.) Dr. Tieu noted Plaintiff's prescription for Abilify had been discontinued, and she was taking Stelazine "to control her psychotic symptoms." (*Id.* at 80.) According to Dr. Tieu, Plaintiff's mood was euthymic and her affect was labile. (*Id.*) Dr. Tieu opined Plaintiff was "doing well" and there were no psychotic symptoms present. (*Id.* at 79-80.)

Dr. Mark Popper performed a consultative examination on August 2, 2011, to determine whether Plaintiff qualified for "an exception to the English and/or civics requirements" of the United States Citizenship Examination. (Doc. 9-9 at 90-95.) He diagnosed Plaintiff with "Major Depressive Disorder, Recurrent, Severe With Psychotic Features, In Partial Remission." (*Id.* at 91.) Dr. Popper diagnosed Plaintiff "using a comprehensive mental status examination" that included tests for her concentration, attention span, memory, and judgment. (*Id.* at 93.) However, Plaintiff "complained that she had a bad memory" and refused to spell the requested word backwards or to perform a serial count down. (*Id.*) Dr. Popper concluded Plaintiff's impairment prevented her from the ability to speak, write, or read English, or "[a]nswer questions regarding United States history and civics, even in a language [she] understands." (*Id.*)

At Plaintiff's appointment with Dr. Tieu in November 2011, she reported that she had insomnia and "was often sedated with Stelazine." (Doc. 9-9 at 78.) In addition, Plaintiff said "[s]he was hearing voices talking to her." (*Id.*) She requested to be taken off the Stelazine, and Dr. Tieu discontinued the prescription. (*Id.*) Plaintiff began to take Seroquel "to control her psychotic symptoms and to help her sleep at night." (*Id.*) However, in January 2012, Plaintiff reported that she was "still hearing voices talking to her." (*Id.* at 74.) In response, Dr. Tieu increased the dosage of Seroquel. (*Id.*)

**B.  Administrative Hearing**

   1.   Plaintiff

Plaintiff testified with the assistance of an interpreter at a hearing on July 6, 2012. (Doc. 9-3 at 32.) Plaintiff said she lived with her husband and had eight children. (*Id.* at 40-41.) She said three of the children were under the age of 18, with the youngest being 9 years old, and she did not know the ages of the others. (*Id.* at 40.) She testified that she did not interact with her family at home except "once in a while." (*Id.* at 42.) Plaintiff explained she did not like to visit with people or "go anywhere" because she felt depressed. (*Id.* at 41.)

Plaintiff said she was able to bathe and dress herself, and she cooked "sometimes." (Doc. 9-3 at 49.) Her children took care of household chores such as washing dishes, doing laundry, vacuuming, and taking out the garbage. (*Id.*) Plaintiff said she sometimes went shopping with her daughter. (*Id.*)

Plaintiff said she was unable to work because she had "back pain and dizziness." (Doc. 9-3 at 43.) On a scale of 1 to 10, Plaintiff said the pain level was an 8. (*Id.*) In addition, Plaintiff said she felt depressed and had difficulty remembering things. (*Id.* at 41, 54.) Plaintiff said that she had been treated at a clinic for her problems for as long as she had been in the United States, but she could not recall when she came to the country. (*Id*. at 42.)

2. Vocational Expert

The ALJ called Cheryl Chandler, a vocational expert ("VE"), to consider several hypothetical individuals. (Doc. 9-3 at 57-58.) The ALJ asked the VE to consider a person who was able to "lift 20 pounds occasionally/ 10 pounds frequently; stand and walk six hours out of an eight-hour day; sit six hours out of an eight-hour day; [and] push and pull an unlimited amount up to the … 20 and 10." (*Id.*) The VE opined such a person could perform light, unskilled work such an agricultural worker (*DOT*[3] 405.687-010), poultry worker (*DOT* 525.687-042), and sewing machine operator (*DOT* 785.685-018). (*Id.* at 58-59.)

Next, the ALJ added non-exertional limitations for the hypothetical worker, and asked the VE to consider someone who was "able to do sustained, simple, repetitive tasks and is able to relate and adapt." (Doc. 9-3 at 59.) The VE opined "the previously cited jobs would be available," as well as others in the economy. (*Id.*)

C. **The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the application date of October 27, 2010. (Doc. 9-3 at 19.) Second, the ALJ found Plaintiff's severe impairments included: "diabetes mellitus not well controlled; polyarthralgia; peripheral neuropathy; hypertriglyceramina; major depressive disorder with psychotic features in

---

[3] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy. *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

7

partial remission; and carpal tunnel syndrome bilaterally status post releases." (*Id.*)  The ALJ found Plaintiff's impairments did not meet or medically equal a listing.  *Id.*

After considering "the entire record," the ALJ determined Plaintiff had the residual functional capacity "to perform less than the full range of light work" with the limitation to "simple repetitive tasks." (Doc. 9-3 at 21.)  With this RFC, Plaintiff was capable of "jobs that exist in significant numbers in the national economy," including light, unskilled work as an agricultural worker, poultry worker, and sewing machine operator.  (*Id.* at 26-27.) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 27.)

## DISCUSSION AND ANALYSIS

Plaintiff argues the RFC is not supported by substantial evidence in the record, and that "[t]he ALJ lacked a sufficient basis for rejecting the limitations reflected in the treatment notes of Dr. Tieu or the report for immigration purposes by Dr. Popper." (Doc. 12 at 6, 9.)  Therefore, Plaintiff argues that the ALJ's findings regarding her mental RFC should be vacated.  (*Id.* at 10.)  On the other hand, Defendant asserts the ALJ's mental RFC assessment is supported by substantial evidence in the record, and should be affirmed.  (Doc. 13 at 4-8.)

### A.     Evaluation of the Medical Evidence

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Also, an examining physician's opinion is given more weight than the opinion of a non-examining physician.  20 C.F.R. §§ 404.1527(d)(2), 416.926(d)(2).

A physician's opinion is not binding upon the ALJ, and may be rejected whether it is contradicted by another.  *Magallanes*, 881 F.2d at 751.  Where the opinion of a treating physician is not contradicted, an ALJ must set forth "clear and convincing" reasons to reject the opinion.  *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).  On the other hand, with "specific and legitimate"

reasons, supported by substantial evidence in the record, an ALJ may reject the contradicted opinion of a physician. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The opinion of a treating physician may be rejected whether or not the opinion is contradicted by another. *Magallanes*, 881 F.2d at 751.

Here, Plaintiff's treating physician Dr. Tieu did not offer any opinion related to Plaintiff's limitations and abilities. Nevertheless, the ALJ reviewed the treatment notes from the clinic and found they "show the claimant consistently presented with an intact memory, was able to effectively communicate with her providers, demonstrated improvement, and reported improvement with treatment." (Doc. 9-3 at 24.) The ALJ noted in 2012, Plaintiff reported auditory hallucinations, nightmares, continued social isolation and paranoia but "she was observed to be cooperative, and have fair grooming and hygiene." (*Id*.) Thus, contrary to Plaintiff's assertion, the ALJ did not reject the findings and observations of Dr. Tieu in the treatment notes.[4]

On the other hand, the ALJ rejected the opinion of Dr. Popper offered in relation to the immigration test. (Doc. 9-3 at 26.) The ALJ noted Dr. Popper did not have a treating relationship with Plaintiff, and the opinion "was inconsistent with the other evidence in the record which shows that, with treatment, the claimant reported improvement in her psychiatric health which was observed by providers and in others with an increase in her outside activities." (*Id.*) Significantly, the Ninth Circuit has determined that these are specific, legitimate reasons for not giving an opinion controlling weight. An ALJ is permitted to consider the length of a treating relationship as a factor in the medical assessment. 20 C.F.R. §§ 404.1527(d)(2), 416.926(d)(2). Further, an ALJ may reject an opinion that is "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). Here, the ALJ determined Dr. Popper's assessment was inconsistent with the treatment notes that indicated

---

[4] Plaintiff does not identify any limitations from the treatment notes that she believes the ALJ should have adopted. Notably, a review of the treatment notes from Dr. Tieu indicates that the only limitations mentioned were Plaintiff's subjective complaints and not limitations determined by the physician. The ALJ rejected Plaintiff's credibility, and this is not challenged by Plaintiff.

9

Plaintiff was improving with treatment and medication. (Doc. 9-3 at 26.) Therefore, the ALJ identified a specific, legitimate reason to reject the opinion.

### B. Substantial evidence supports the RFC

The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8. "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.* Here, the opinions of Dr. Murillo and Kravatz, non-examining physicians, support the finding that Plaintiff was capable of performing simple repetitive tasks.

The opinions of non-examining physicians "may constitute substantial evidence when . . . consistent with other independent evidence in the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995). Here, Dr. Murillo noted that Plaintiff's symptoms had improved with treatment, and opined Plaintiff was "not significantly limited" with her ability to understand, remember, and carry out very short and simple instructions. (Doc. 9-9 at 41, 53.) The ALJ gave "great weight" to this opinion, because it was "consistent with treatment notes in evidence which show the claimant consistently presented with an intact memory, was able to effectively communicate with her providers, demonstrated improvement, and reported improvement with treatment." (Doc. 9-3 at 25; *see also* Doc. 9-8 at 151 [in September 2010, Plaintiff reported she was "feeling better gradually]; Doc. 9-8 at 150 [in December 2010, Plaintiff did not report any problems]; Doc. 9-9 at 61 [in February 2011, Plaintiff said "the medication helps her" and Dr. Tieu opined Plaintiff was "doing well"]; Doc. 9-9 at 57 [in March 2011, Plaintiff continued to report the medication was helping]). Moreover, although the ALJ did not address the opinion of Dr. Kravatz in his decision, the assessment of Dr. Murillo was affirmed "as written" by Dr. Kravatz. (Doc. 9-9 at 73.) Accordingly, the ALJ's decision was supported by substantial evidence in the record, including the opinions of Dr. Murillo and Kravatz.

### CONCLUSION AND ORDER

Notably, the ALJ's resolution of a conflict in the medical record must be upheld by the Court even when there is "more than one rational interpretation of the evidence." *Allen*, 749 F.2d at 579; *see*

*also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Because the ALJ applied the proper legal standards and his findings are supported by substantial evidence, the decision must be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Ee Tong See.

IT IS SO ORDERED.

Dated:     **March 31, 2015**                    /s/ Jennifer L. Thurston
                                                                  UNITED STATES MAGISTRATE JUDGE